**UNITED STATES DEPARTMENT OF JUSTICE**
**OFFICE OF THE UNITED STATES TRUSTEE**
**KEVIN M. EPSTEIN**
**UNITED STATES TRUSTEE**
**GARY WRIGHT**
**ASSISTANT UNITED STATES TRUSTEE**
**903 SAN JACINTO BLVD., ROOM 230**
**AUSTIN, TX 78701**
**Telephone: (512) 916-5328**

## UNITED STATES BANKRUPTCY COURT
## WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

In re:

JOHN ANDREW GOODMAN,                                    CASE NO. 24-10806-SMR
                                                                          CHAPTER 7

                      DEBTOR

_____

KEVIN M. EPSTEIN
UNITED STATES TRUSTEE
REGION 7,
                      PLAINTIFF
                                                                          ADV. NO.
v.

JOHN ANDREW GOODMAN,


                      DEFENDANT

_____

## <u>COMPLAINT OBJECTING TO DISCHARGE OF THE DEBTOR</u>

TO THE HONORABLE SHAD M. ROBINSON,
UNITED STATES BANKRUPTCY JUDGE:

      Plaintiff, Kevin M. Epstein, the United States Trustee for Region 7, which includes the

Western District of Texas, objects to the entry of discharge for the above Debtor under

11 U.S.C. §§ 727(a)(2)(A), 727(a)(2)(B), 727(a)(3), 727(a)(4)(A), 727(a)(4)(D), 727(a)(5),

1

727(a)(6)(A), and 727(a)(7) and in support of this complaint respectfully represents and alleges as follows:

**JURISDICTION AND VENUE**

1.      The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 1334 and 28 U.S.C. § 157.

2.      This matter is a core proceeding under 28 U.S.C. § 157(b)(2)(J).

3.      Venue in this Court is proper pursuant to 28 U.S.C. § 1409(a).

4.      Plaintiff is authorized to bring this complaint pursuant to 11 U.S.C. §§ 307 and 727(c)(1).

5.      The original deadline for filing an objection to Defendant's discharge was October 15, 2024. Pursuant to the Court's Order Granting Agreed Motion to Extend Deadlines to File a Complaint Pursuant to 11 U.S.C. § 727 and/or 11 U.S.C. § 523 entered on May 22, 2025, Plaintiff's current deadline to file a complaint objecting to Defendant's discharge is July 15, 2025. This Complaint is filed prior to the expiration of the deadline.

**PARTIES**

6.      Plaintiff, Kevin M. Epstein, the United States Trustee for Region 7, which includes the Western District of Texas, monitors and supervises the administration of cases commenced under Chapters 7, 11, 12, and 13 of the Bankruptcy Code pursuant to 28 U.S.C. § 586(a)(3) and brings this action pursuant to 11 U.S.C. § 727(a).

7.      Defendant, John Andrew Goodman, is an individual debtor under Chapter 7 of the Bankruptcy Code in the Western District of Texas, Austin Division, Case No. 24-10806-SMR-7 (Bankruptcy Case).

**FACTUAL ALLEGATIONS**

8.      Plaintiff is informed and believes that Defendant is an experienced individual who has formed and operated numerous businesses. On July 10, 2024, Defendant filed bankruptcy

under Chapter 7. Upon information and belief, Defendant is familiar with the bankruptcy requirements to provide complete, truthful, and accurate information on his Schedules and Statement of Financial Affairs.

9.      Defendant is an owner, director, officer and/or controlling person for the Goodman MBE Group, GNI, MFS, GNET ATC, GBE, the GTH Group, CSL, GDMN 1, GDMN 2, GDMN 3, GDMN GP, GDMN LP, and Joker, and trustee and/or beneficiary of the Trusts.[1]

## **KEY PERSONS**

10.      The following persons are defined because they are key persons for purposes of the allegations in this Complaint:

   a.      James Elmer Goodman (James) is Defendant's brother, a RICO Defendant, an owner, director, officer and/or controlling person for the Goodman MBE Group, GNI, MFS, GNET ATC, GBE, GIH, the GIH Affiliates, GNE, the Genesis Companies, PeopleNQ, and JJCP.

   b.      Jason Goodman (Jason) is Defendant's brother, a RICO Defendant, an owner, director, officer and/or controlling person for the Goodman MBE Group, GNI, MFS, GNET ATC, and GBE.

   c.      Joseph "Jody" Goodman (Jody) is Defendant's brother, a RICO Defendant, an owner, director, officer and/or controlling person for the Goodman MBE Group, GNI, MFS, GNET ATC, and GBE.

   d.      Jonathan Goodman (Jonathan) is Defendant's brother, a RICO Defendant, an owner, director, officer and/or controlling person for the Goodman MBE Group, GNI, MFS, GNET ATC, and GBE.

   e.      For purposes herein, Defendant, James, Jason, Jody, and Jonathan are collectively the "Goodman Brothers."

   f.      Cayenne Soni Goodman (Cayenne) is the ex-wife of Defendant, the mother of JAG-1 and JAG-2, and a trustee and/or beneficiary of the Trusts.

---

[1] The capitalized terms in this paragraph and those below are defined in the Complaint. To the extent terms are not defined in this Complaint, they shall have the same meaning as those filed in the complaint filed at docket # 1 in Adv. Proc. No 25-01023 (FSCLE Adversary).

g.   Defendant and Cayenne are co-trustees under the John and Cayenne Goodman Living Trust, dated December 5, 2022 (JC Trust), which is a trust for the benefit of Defendant and Cayenne.

h.   Jailee Alexis Goodman (JAG-1) is the adult daughter of Defendant and Cayenne and a beneficiary of the Trusts.

i.   Defendant and Cayenne are co-trustees under the Jailee Alexis Goodman Living Trust, dated August 24, 2015 (JAG-1 Trust), which is a trust for the benefit of JAG-1.

j.   J*** A*** Goodman (JAG-2) is the minor son of Defendant and Cayenne and a beneficiary of the Trusts.

k.   Defendant and Cayenne are co-trustees under the J*** A*** Goodman Living Trust, dated August 24, 2015 (JAG-2 Trust) is a trust for the benefit of JAG-2.

l.   Jacob Soni (Soni) is the father of Cayenne, the ex-father-in-law of Defendant, and a beneficiary of the Trusts.

m.   Defendant and Cayenne are co-trustees under the Jacob Soni Living Trust, dated December 31, 2024 (Soni Trust) is a trust for the benefit of Soni.

n.   J*** Piel (Piel) is Defendant's daughter from a prior marriage.

o.   For purposes herein, the JC Trust, the JAG-1 Trust, the JAG-2 Trust, and the Soni Trust are collectively the "Trusts".

p.   Goodman Networks, Inc. (GNI) is a Texas corporation that is the debtor in the chapter 7 bankruptcy case, being Case No. 22-31641 (GNI Bankruptcy) in the United States Bankruptcy Court for the Northern District of Texas (NDTX Bankruptcy Court). GNI is the owner of MFS and GNET ATC.

q.   Multiband Field Services, Inc. (MFS) is a Delaware corporation that is the subject of a chapter 11 bankruptcy case, being Case No. 25-30515 (MFS Bankruptcy) in the NDTX Bankruptcy Court. MFS is a wholly owned subsidiary of GNI.

r.   GNET ATC, LLC (GNET ATC) is a Texas limited liability company that is wholly owned subsidiary of GNI.

4

s.    Goodman MBE Group LP is a Texas limited partnership, and Goodman MBE Group GP, LLC is a Texas limited liability company (collectively, Goodman MBE Group). Defendant holds a 1/5 ownership interest in the Goodman MBE Group. The Goodman MBE Group is a shareholder in GNI that was purporting to exercise control over GNI at the time the GNI Bankruptcy was commenced.

t.    Goodman Brothers, L.P. is a Texas limited partnership, in which Defendant holds a 1/5 ownership interest.

u.    Goodman Brothers Enterprises, Inc. (GBE), a Texas corporation, is the general partner in the limited partnership. Defendant, as President of GBE, is the controlling person for GBE. GBE owns 488.52 acres of real property in San Saba County, Texas (Goodman Brothers Ranch).

v.    Genesis Networks Telecom Services, LLC (Genesis-ATC) is a Texas limited liability company that is the debtor in a chapter 7 bankruptcy case, being Case No. 24-33835 (Genesis Bankruptcy) in the NDTX Bankruptcy Court.

w.    Genesis Networks Enterprises, LLC (GNE) is a Texas limited liability company that was the former parent company of Genesis-ATC and the predecessor entity to GIH (defined below).

x.    Symbiont Ventures, LLC f/k/a Goodman Investment Holdings, LLC (GIH) is a Texas limited liability company that is majority owned and controlled by James and minority owned by Networks Investments, LLC. GIH is the successor in interest to GNE and the holding company or controlling entity for numerous entities affiliated with the Goodman family including but not limited to Genesis-ATC, Genesis Networks Global Service, LLC (GNGS), Genesis Networks Integration Services, LLC (GNIS), Austin Tele-Services, LLC (ATS), Telespace LLC (Telespace), and Endeavor Managed Services, Inc. (Endeavor) (GIH Affiliates). Upon information and belief, Defendant has or had consulting agreements with some GIH Affiliates.

y.      Genesis-ATC, GNE, GNGS, GNIS, ATS, and Telespace, and their affiliates are collectively referred herein as the "Genesis Companies".

z.      Greater Tech Holdings, Inc. f/k/a Goodman Telecom Holdings, LLC (GTH) is a Texas limited liability company that is the debtor in a chapter 7 bankruptcy case, being Case No. 24-32818 (GTH Bankruptcy) in the United States Bankruptcy Court for the Southern District of Texas (SDTX Bankruptcy Court). GTH was majority owned by Defendant, and GNI was a minority shareholder in GTH. Janet Casciato-Northrup (Northrup) is the appointed chapter 7 trustee in the GTH Bankruptcy.

aa.     TechDash Telecom, LLC. f/k/a Goodman Telecom Services, LLC (GTS) is a Texas limited liability company that is the debtor in a chapter 7 bankruptcy case, being Case No. 24-32820 (GTS Bankruptcy) in the SDTX Bankruptcy Court. GTS is a wholly owned subsidiary of GTH. Randy Williams (Williams) is the appointed chapter 7 trustee in the GTS Bankruptcy.

bb.     TechDash Communications, LLC, f/k/a Goodman Communications Services, LLC (GCS) is a Texas limited liability company that is the subject of a chapter 7 bankruptcy case, being Case No. 24-32819 (GCS Bankruptcy) in the SDTX Bankruptcy Court. GCS is a wholly owned subsidiary of GTH.

cc.     DeBauche OSP Communications, LLC (DeBauche) is a Texas limited liability company that is the subject of a chapter 7 bankruptcy case, being Case No. 24-32817 (DeBauche Bankruptcy) in the SDTX Bankruptcy Court. DeBauche is a wholly owned subsidiary of GTH.

dd.     Collectively, GTS, GCS, and DeBauche are the "GTH Subs" and with GTH are the "GTH Group".

ee.     Collectively, the bankruptcy cases filed by the GTH Group are called the GTH Group Bankruptcies.

ff.     GDMN Family Investments 1, LLC (GDMN 1) is a Texas limited liability company. Upon information and belief, Defendant has an ownership interest in GDMN 1.

6

gg.    GDMN Family Investments 2, LLC (GDMN 2) is a Texas limited liability company wholly owned by Defendant.

hh.    GDMN Family Investments 3, LLC (GDMN 3) is a Texas limited liability company wholly owned by Defendant. Upon information and belief Defendant has an ownership interest in GDMN 3.

ii.    GDMN Family Investments GP, LLC (GDMN GP) is a Texas limited liability company. Upon information and belief, Defendant has an ownership interest in GDMN GP.

jj.    GDMN Family Investments, LP (GDMN LP) is a Texas limited partnership. Upon information and belief, Defendant has an ownership interest in GDMN LP.

kk.    B&R Joker Adventures, LLC (Joker) is a Texas limited liability company wholly owned by Defendant.

ll.    CSL Investments, LLC (CSL) is a Wyoming limited liability company wholly owned by Defendant.

mm.    FedEx Supply Chain Logistics & Electronics, Inc. a Delaware corporation (FSCLE), is the plaintiff in a pending case filed in the United States District Court for the Northern District of Texas (RICO Case). Defendant, along with 25 named co-conspirators, are defendants in the RICO Case.

## RICO CASE[2]

8.    In the RICO case, Defendant and his co-conspirators are (A) alleged to have participated in racketeering activities to defraud FSCLE and embezzle and launder its monies (the FSCLE Funds) and (B) the subject of multiple causes of action including: (1) violation of the federal Racketeering Influenced and Corrupt Organizations Act (commonly known as the Civil R.I.C.O. Act), 18 U.S.C. § 1961 et seq.; (2) theft (embezzlement) pursuant to the Texas Theft

---

[2] The allegations in this section of the Complaint include information alleged by FSCLE in the complaint filed in the FSCLE Adversary. The allegations in the complaint filed in the FSCLE Adversary (Dkt. # 1 in the FSCLE Adversary) are referenced and incorporated herein to the extent not inconsistent with the special allegations made herein.

Liability Act, Tex. Civ. Prac. & Rem. Code § 134.003-.005; (3) common law theft/embezzlement/conversion; (4) common law unjust enrichment; (5) common law fraud; and (6) civil conspiracy (RICO Enterprise).

9.      Plaintiff incorporates herein by reference the factual allegations made by FSCLE in the Second Amended Complaint filed in the RICO Case attached hereto as **Exhibit 1** (RICO Complaint) to the extent they are not inconsistent with the allegations made herein.

10.      Upon information and belief, beginning in 2018, Defendant, his brothers, and other co-conspirators engaged in a scheme to defraud FSCLE of more than eighty-one million dollars ($81,000,000) and then to launder that stolen money through a series of fraudulent commercial transactions by which Defendant and his co-conspirators benefited and participated in significant ways (RICO Enterprise).

11.      Upon information and belief, Defendant, his brothers, and other co-conspirators engaged in this scheme to defraud FSCLE because of a dispute between Technicolor and AT&T regarding AT&T's obligation to purchase products and goods from Technicolor through Genesis-ATC (AT&T Dispute), an entity owned by the Goodman Brothers, that began on or about December 10, 2018.

12.      Upon information and belief, FSCLE purchased products from AT&T, and Genesis-ATC provided logistics services related to the products FSCLE purchased from AT&T.

13.      Upon information and belief, because of the AT&T Dispute, AT&T demanded Genesis-ATC indemnify it for the claims asserted by Technicolor (AT&T Demand). Upon information and belief, AT&T commenced an arbitration proceeding against Genesis-ATC regarding the AT&T Demand on or about February 19, 2020 (AT&T Arbitration).

14.      Upon information and belief, AT&T was awarded approximately $12.3 million against Genesis-ATC related to the AT&T Demand on or about November 18, 2020 (AT&T Arbitration Award).

15.      Upon information and belief, AT&T terminated its contracts with the Goodman businesses, including Genesis-ATC, by October 2021.

16.      Upon information and belief, Defendant, his brothers, and other co-conspirators never informed FSCLE that AT&T terminated its contracts. Upon information and belief, instead,

Defendant, his brothers, and other co-conspirators continued to engage in business with FSCLE under false pretenses while moving assets to avoid the AT&T Arbitration Award.

17.     Upon information and belief, Defendant participated in racketeering activities that caused at least $67,000,000 of funds belonging to FSCLE to be embezzled from FSCLE into GNI under fraudulent pretenses and pursuant to fraudulent written and oral statements.

18.     Upon information and belief, Defendant participated in racketeering activities that caused more than $81,000,000 of funds to be embezzled from GNI and laundered through a series of shell companies.

19.     Upon information and belief, Defendant and his businesses knowingly received and used embezzled funds and the proceeds thereof from FSCLE and were the intended beneficiaries of even more embezzled funds and the proceeds thereof during the GNI Bankruptcy.

## THE BANKRUPTCY CASES

20.     There are eight pending bankruptcy cases involving Defendant, his brothers, and other co-conspirators, including this Bankruptcy Case, the GNI Bankruptcy, the MFS Bankruptcy, the GTH Group Bankruptcies, and the Genesis-ATC Bankruptcy.

21.     In this Bankruptcy Case, there are three pending adversary proceedings. The first is *Lowe v. Goodman, et al.*, Adv. Proc. No. 24-01056 (JG/Trusts Adversary). The allegations in the complaint filed at docket # 1 in the JG/Trusts Adversary are referenced and incorporated herein to the extent not inconsistent with the special allegations made herein.

22.     The second adversary in the Bankruptcy Case is *UMB Bank v. Goodman*, Adv. Proc. No. 25-01022 (UMB Adversary). The allegations in the complaint filed at docket # 1 in the UMB Adversary are referenced and incorporated herein to the extent not inconsistent with the special allegations made herein.

23.     The third adversary in the Bankruptcy Case is the FSCLE Adversary. The allegations in the complaint filed at docket # 1 in the FSCLE Adversary are referenced and incorporated herein to the extent not inconsistent with the special allegations made herein.

24.     On September 6, 2022, the GNI Bankruptcy commenced by an involuntary chapter 7 petition filed by certain bondholders of GNI. FSCLE and other creditors later joined as

petitioning creditors. Defendant appeared as the GNI "representative" during the involuntary gap period before an order for relief was entered.

25.     Upon information and belief, Defendant exercised de facto control over GNI through the Goodman MBE Group from May 2022 forward.

26.     Upon information and belief, the Goodman Brothers, through the Goodman MBE Group, resolved that Defendant, who was the manager of the general partner from the Goodman MBE Group, is authorized to enter into a consulting agreement between the Goodman MBE Group and GNI that provided Defendant complete control over GNI on September 21, 2022.

27.     Upon information and belief, despite the above, Defendant did not have proper authority to act as GNI's sole fiduciary during the GNI Bankruptcy because it did not comply with GNI's corporate governance document.

28.     Upon information and belief, during the GNI Bankruptcy, Defendant caused GNI to file numerous pleadings and objections that were knowingly false, without merit, did not have proper authority, and injured creditors, including but not limited to statements that he had actual control over GNI through a consulting agreement with the Goodman MBE Group.

29.     On December 12, 2022, the NDTX Bankruptcy Court granted a chapter 7 order for relief against GNI and soon thereafter approved the appointment of Scott Seidel (Seidel) as the chapter 7 trustee.

30.     On January 7, 2023, Defendant, without having the actual authority to do so, caused to be filed schedules and a statement of financial affairs for GNI (GNI Schedules). GNI Bankruptcy, Dkt. #'s 184 and 185.

31.     Defendant, purportedly acting for GNI even though he did not have actual authority, attempted to convert the GNI Bankruptcy from chapter 7 to chapter 11 so that he could remain in control of the GNI Bankruptcy.

32.     On October 27, 2023, FSCLE filed the original RICO Complaint commencing the RICO Case. At that time, GTH and Genesis-ATC were named RICO Defendants.

33.     On February 19, 2024, the Genesis-ATC Bankruptcy commenced by a chapter 7 petition filed by Tina Younts (Younts). Martin Seidler, who is Defendant's bankruptcy attorney, was also the attorney on that filing.

34.     Upon information and belief, Younts had no authority to act on behalf of Genesis-ATC, yet she filed the petition, schedules, and appeared at the section 341 meeting of creditors.

35.     Upon information and belief, the Genesis-ATC petition was filed to obstruct the GNI Bankruptcy and the RICO Case.

36.     On March 15, 2024, Younts caused Genesis-ATC to file its bankruptcy schedules (Genesis-ATC Schedules) in the United States Bankruptcy Court for the Western District of Texas (WDTX Bankruptcy Court). Genesis-ATC Bankruptcy, dkt. # 11.

37.     Upon information and belief, the Genesis-ATC Schedules contained fraudulent and material falsities, misrepresentations and omissions regarding Genesis-ATC and the RICO Enterprise.

38.     Upon information and belief, James directed Younts to file the Genesis-ATC Schedules and, upon information and belief, the Goodman Brothers, including Defendant, had actual knowledge of the Genesis-ATC Schedules.

39.     Upon information and belief, Martin Seidler, acting for Genesis-ATC and Defendant, was coordinating the bankruptcies of both at this time.

40.     Upon information and belief, the Genesis-ATC Schedules were filed to obstruct the GNI Bankruptcy and the RICO Case and further the RICO Enterprise.

41.     Creditors called for an election for trustee in Genesis-ATC, and Laurie Rea (Rea) was elected as the chapter 7 trustee by the participating creditor body. Younts and/or Martin Seidler caused Genesis-ATC to dispute the election.

42.     On May 16, 2024, the United States Trustee filed a report of a disputed election. Genesis-ATC Bankruptcy, dkt. # 43.

43.     The WDTX Bankruptcy Court entered an agreed order confirming the election of Rea as trustee on June 11, 2024.

44.     On June 18, 2024 (GTH Petition Date), Wesley Hesker (Hesker), Defendant's brother-in-law, caused the GTH Group to file voluntary chapter 7 petitions commencing the GTH Group Bankruptcies. Each petition was signed by Hesker as a consulting Chief Liquidation Officer.

45.     Upon information and belief, the GTH Group Bankruptcies filings were controlled by Defendant. Upon information and belief, Defendant paid Hesker $59,800.

11

46. Hesker stated in each petition:

Mr. Hesker has not (nor could have) personally verified the accuracy of each statement and representation, including, for example, statements and representations concerning amounts owed to creditors, classification of such amounts, and their addresses. In addition, Mr. Hesker has not (nor could have) personally verified the completeness of the Schedules and Statements, nor the accuracy of any information contained therein.

*See e.g.*, GTH Bankruptcy, dkt. # 1.

47. Upon information and belief, the GTH Group Bankruptcies were filed to obstruct the GNI Bankruptcy and the RICO Case and further the schemes alleged in the RICO Complaint.

48. On July 2, 2024, the GTH Group filed their bankruptcy schedules signed by Hesker. (DeBauche Bankruptcy, dkt. #'s 9-18; GTH Bankruptcy dkt. # 9-18; GTS Bankruptcy dkt. # 10-19; GCS Bankruptcy, dkt. # 9-18; collectively, the "GTH Schedules"). Each of the GTH Schedules contained the same disclaimer that was attached to the petitions. *See e.g.*, GTH Bankruptcy dkt. # 9.

49. The GTH Schedules stated: "This Debtor and the three related debtors listed on the petition operate from similar locations and it may appear that assets owned by other debtors are in the possession of this debtor." *See e.g.*, GTH Bankruptcy, dkt. # 15, p. 8.

50. Upon information and belief, the GTH Group debtors used Netsuite, a business ERP run by Oracle Inc., for its data and email retention. The GTH Schedules stated: "Access to Netsuite ceased before the end of 2023. No person is getting financial records sent or has access to them any longer…. All of the debtors lost access to their books and records when online access was cancelled in February of 2024. The persons who had access to books and records at that time included Scott Pickett, Geoffrey Miller, John Goodman, Wes Hesker, Matt Keylon, Paula Dodd, and Hannah Perez." *See e.g.*, GTH Bankruptcy, dkt. # 15, p. 12, Items 26c.9 and 26c.10.

51. Upon information and belief, the GTH Group debtors did not possess any material books and records, and none have been produced to the chapter 7 trustees in the GTH Group Bankruptcies to date.

52. On August 4, 2022, Houlihan Capital Advisors, LLC, issued a valuation report for the GTH Group, as of June 30, 2022, and indicated the fair market value of the GTH Group was $130 million. GTH scheduled total assets equal to $3,248.65. GTH Bankruptcy, dkt. # 14.

53.     In Defendant's Bankruptcy Case, the Schedules show the equity in GTH has no value.

54.     Defendant failed to satisfactorily explain the loss of assets for the GTH Group.

55.     On June 28, 2024, Younts appeared as the debtor "representative" at the Genesis-ATC section 341 meeting of creditors. Upon information and belief, Younts lacked material information related to Genesis-ATC. Younts testified that James was the person who had knowledge and the recorded information of Genesis-ATC was held by GIH or the GIH Affiliates. Upon information and belief, this was done to obstruct the GNI Bankruptcy and the RICO Case and further the RICO Enterprise.

56.     Upon information and belief, Genesis-ATC had not produced to Rea material recorded information, including books, documents, records, and papers, regarding Genesis-ATC's financial condition and business transactions. This recorded information is property of the Genesis-ATC estate but in the custody of James and the GIH Affiliates.

57.     Upon information and belief, the recorded information of Genesis-ATC is commingled with the recorded information of GNI, MFS, GNET ATC, and other GIH Affiliates (Endeavor Data).

58.     Upon information and belief, the Endeavor Data includes email addresses, documents, and files used by Defendant, GNI, MFS, GNET ATC, the GTH Group, and contains recorded information pertaining to Defendant's financial condition and business transactions.

59.     Upon information and belief, the Endeavor Data contains material information related to the RICO Enterprise.

60.     Upon information and belief, Rea, FSCLE, and Seidel demanded that Endeavor turnover the Endeavor Data.

61.     With the Endeavor Data discovered, on July 10, 2024, (Petition Date) Defendant filed a voluntary petition (Petition) under Chapter 7 of the Bankruptcy Code along with Forms 122A-1 and Forms 122A-1Supp (MTF) and his Statement of Intention, but without the schedules and Statement of Financial Affairs (SoFA) required by 11 U.S.C. 521(a). Dkt. # 1.

62.     John Patrick Lowe was appointed Chapter 7 trustee (the Chapter 7 Trustee). Dkt. # 3. The 341 Meeting of Creditors was originally scheduled for August 15, 2024. *Id.*

63.     The Genesis-ATC Bankruptcy and this Bankruptcy Case were both filed by attorney Martin Seidler.

64.     Defendant filed his *Motion for Enlargement of Time in Which to File Schedules and Statement of Financial Affairs* (First MTE) on July 10, 2024. Dkt. # 6. In the First MTE, Defendant requested an extension through August 10, 2024. Dkt. # 6, ¶ 6. Defendant claimed cause existed to extend the deadline because Defendant filed the case on an expedited basis due to numerous pending lawsuits, his counsel was going on vacation, and Defendant and his counsel had not had sufficient time to meet to complete the Schedules and SoFA. Dkt. # 6. On August 6, 2024, the Court entered an order allowing the extension through August 10, 2024. Dkt. # 32.

65.     On August 5, 2024, FSCLE filed a Rule 2004 motion seeking recorded information in the Genesis-ATC Bankruptcy from James, GIH, and Endeavor, including recorded information held in the Endeavor Data. Genesis-ATC Bankruptcy, dkt. # 63.

66.     Defendant filed his *Second Motion for Enlargement of Time in Which to File Schedules and Statement of Financial Affairs* (Second MTE) on August 9, 2024. Dkt. # 34. In the Second MTE, Defendant requested an extension through August 26, 2024. Dkt. # 34, ¶ 9. Defendant claimed cause existed to extend the deadline because Defendant's counsel was on vacation and because Defendant, his wife, and son contracted COVID-19 that required Defendant's son to be hospitalized and impaired Defendant's ability to work with counsel. Dkt. # 34. On September 6, 2024, the Court entered an order allowing the extension through August 26, 2024. Dkt. # 54.

67.     The first 341 Meeting of Creditors was scheduled for August 15, 2024. The Chapter 7 Trustee adjourned the first meeting of creditors to September 6, 2024, due to no statements and schedules being filed at the time of the meeting.

68.     Meanwhile, on August 26, 2024, Defendant filed his first set of schedules (First Schedules) and SoFA (First SoFA) in this Bankruptcy Case. Dkt. # 44.

69.     Before filing the First Schedules, Defendant signed the Declaration Concerning Debtor's Schedules and SoFA declaring under penalty of perjury that he had read the First Schedules and SoFA and that they were true and correct. Dkt. # 44, p. 134.

14

70.     Attached to the First Schedules were disclaimers. Dkt. # 44-1. Therein, Defendant caveated that the First Schedules were only "based upon the documents currently available to the debtor" and that the "debtor's ill health" due to Covid-19 "impaired his ability, to some extent, to recall some remote financial transactions." He continued that the First Schedules "do not reflect his spouse's income or expenses or assets in her possession or transfers by her, except as stated therein due to his lack of access." He also stated therein that "[t]wo of the debtor's bank accounts were closed in the years before filing and electronic access was terminated."

71.     Defendant did not disclose any interest in GDMN 2 in the First Schedules.

72.     Defendant did not disclose any interest in GDMN 1, GDMN 3, GDMN GP, GDMN LP and certain bank accounts (detailed below) and did not fully disclose the relationships, partnerships, and other transactions that are a part of the RICO Enterprise in the First Schedules. Upon information and belief, this was done to conceal GDMN 2 and further the RICO Enterprise.

73.     Defendant filed an amended petition (Amended Petition) on August 26, 2024. Dkt. # 42. The Amended Petition disclosed two previously undisclosed affiliate bankruptcy cases. Dkt. # 42, line 9.

74.     The Defendant testified under oath at the second 341 Meeting of Creditors held on September 6, 2024, that he read the First Schedules and First SoFA before he signed them and that there were several amendments that needed to be made. Defendant further testified that the First Schedules failed to list all his assets and liabilities and needed to be amended. The Chapter 7 Trustee adjourned the 341 Meeting of Creditors to October 18, 2024, pending the receipt of additional information.

75.     On September 30, 2024, the Chapter 7 Trustee filed a Motion to Compel Turnover of Property of the Estate (Turnover Motion), which requested Defendant turnover documents related to GDMN 2 in addition to numerous other deficiencies. Dkt. # 70. The Court granted the Turnover Motion on February 19, 2025 (Turnover Order). Dkt. # 162.

76.      In response to Turnover Motion, Defendant began producing some of the requested documents to the Chapter 7 Trustee. Upon information and belief, Defendant has not produced all the documents requested by the Chapter 7 Trustee as of the date of filing this Complaint.

77.     On October 2, 2024, the Chapter 7 Trustee, Seidel, and FSCLE filed a joint motion to transfer venue of the Genesis-ATC Bankruptcy to the NDTX Bankruptcy Court. (ECF No. 81

15

in the Genesis-ATC Bankruptcy). Another GIH affiliate, ATS, purported to be a creditor and objected, and this time an objection was filed Genesis-ATC signed by attorney Martin Seidler. (ECF Nos. 90, 91 in the Genesis-ATC Bankruptcy).

78.     Upon information and belief, James directed the filing of the ATS objection and Defendant and James had knowledge of the filing of both objections.

79.     On October 18, 2024, the Chapter 7 Trustee adjourned the 341 Meeting of Creditors to November 15, 2024, pending the receipt of additional information.

80.     At the fourth 341 Meeting of Creditors on November 15, 2024, Defendant testified under oath that he read the First Schedules and First SoFA before he signed them and that they were true and correct to the best of his knowledge. Defendant further testified that the First Schedules listed all his assets and liabilities. He also testified that it was possible that further amendments need to be made. The Chapter 7 Trustee adjourned the 341 Meeting of Creditors to December 16, 2024.

81.     On November 17, 2024, the Chapter 7 Trustee filed a Witness and Exhibit List that attached public filings related to GDMN 2, which show Defendant as the sole owner of GDMN 2. Dkt. # 117.

82.     On November 22, 2024, the first meeting of creditors in the GTH Bankruptcy was held, and Hesker appeared as the debtor "representative." The meeting was continued.

83.     Upon information and belief, on November 25, 2024, Defendant caused Soni Trust to pay Hesker $1,000.

84.     Upon information and belief, on November 26, 2024, Defendant caused Soni Trust to pay Hesker $5,000.

85.     On December 6, 2024, the final meeting of creditors in the GTH Bankruptcy was held, and Hesker appeared as the debtor "representative."

86.     On December 16, 2024, the Chapter 7 Trustee adjourned the 341 Meeting of Creditors to January 27, 2025, pending the receipt of additional information.

87.     Upon information and belief, on December 18, 2024, Defendant caused the JAG-2 Trust to pay Hesker $4,000.

88.     At the GTH Bankruptcy meeting of creditors, Hesker disclosed that (i) Defendant is the primary person with personal knowledge about the GTH Group debtors and their business

16

affairs; (ii) Defendant directed the filing of the GTH Group Bankruptcies; (iii) Hesker is currently employed or consulting for some of the GIH Affiliates; and (iv) none of the GTH Group Debtors or persons affiliated with the GTH Group Debtors have access to the GTH Groups' business books, documents, records, papers, and emails, which includes Defendant's emails. Hesker did not disclose (i) his relationship as brother-in-law to Defendant and (ii) that he was being paid by Defendant through the Trusts to act as the GTH Groups' debtor representative in the GTH Group Bankruptcies.

89.     Upon information and belief, from the GTH Petition Date to the filing of at least the FSCLE Complaint, Northrup, Williams, and FSCLE have been working to obtain the GTH Groups' business books, documents, records, papers, and emails, and those have not been obtained.

90.     Upon information and belief, the chapter 7 trustees and FSCLE reached a stipulated agreement, approved by the SDTX Bankruptcy Court, for Oracle to provide Northrup, Williams, and FSCLE access to the GTH Groups' business books, documents, records, papers, and emails, among other data (Dkt. #'s 52 and 53), but neither Defendant, Hesker, nor the GTH Group Debtors assisted with the turnover of these business books, documents, records, papers, and emails.

91.     Upon information and belief, Oracle only agreed to provide access after facing the threat of sanctions and costly turnover, automatic stay, and Rule 2004 contests.

92.      Upon information and belief, Defendant, utilizing Hesker, orchestrated the GTH Group Bankruptcies to be filed without business books, documents, records, papers, and emails, and without material, liquid assets to conceal and destroy those business books, documents, records, papers, and emails and to cause such business books, documents, records, papers, and emails to be withheld from the Chapter 7 Trustee and the trustees in the GTH Group Bankruptcies.

93.     Upon information and belief, Defendant, utilizing Hesker, failed to keep or preserve the recorded information, including books, documents, records, papers, and emails, which the Chapter 7 Trustee might ascertain Defendant's financial condition or business transactions.

94.     Upon information and belief, the GTH Group Bankruptcies and their lack of documentation were intended to conceal Defendant's loss of assets and his business transactions.

95.     In the Genesis-ATC case, on November 4, 2024, a day before the hearing on the joint motion to transfer venue, ATS filed an emergency motion to continue the hearing due to James' alleged illness. Genesis-ATC Bankruptcy, dkt. #'s 102 and 103.

96.     The WDTX Bankruptcy Court denied ATS's emergency motion to continue, and the hearing went forward with James present in person. Genesis-ATC Bankruptcy, dkt. #'s 106 and 117. The WDTX Bankruptcy Court granted the motion to transfer venue after an extensive evidentiary hearing. Genesis-ATC Bankruptcy, dkt. # 113.

97.     The Genesis-ATC Bankruptcy was transferred to the NDTX Bankruptcy Court and inter-district transferred to the same judge as the GNI Bankruptcy.

98.     On January 25, 2025, the NDTX Bankruptcy Court held an all-day hearing on a Rule 2004 motion and a motion to compel and then continued it to February 5, 2025. After additional evidence, the NDTX Bankruptcy Court issued a bench ruling granting both motions.

99.     Judge Larson, among other things, found on the record the following:

> To say that the Court was disturbed by Mr. [James] Goodman's testimony, I don't think actually goes far enough.  I don't have near the history with the Genesis matter that Judge Parker might, but the way that this case was filed, let's just say raises alarm bells, that a non-officer and a non-director would have filed this case and be put up as representative at a 341 meeting rather than the principal. I believe that might have been purposeful. I'll be straight with you.   This case was initiated in February of last year [2024]. The fact that we're February [2025] again, and the Debtor's books and records haven't been turned over, is extremely too long.

Genesis-ATC Bankruptcy, dkt. # 154.

100.    Orders were entered on both motions on February 20, 2025, and February 21, 2025. Genesis-ATC Bankruptcy, dkt. # 148, 151.

101.     Upon information and belief, as of the filing of this Complaint, the Endeavor Data has not been turned over to Rea or produced to FSCLE and Seidel.

102.    Genesis-ATC, the GTH Group, and Defendant with intent to hinder, delay, and defraud, their creditors, Seidel, the Chapter 7 Trustee, Rea, Williams, and Northrup, transferred, removed, delayed, mutilated, or concealed, or permitted to be transferred removed, destroyed, mutilated, or concealed the Endeavor Data, the GTH Groups' data on NetSuite, and records regarding Defendant's financial affairs and business transactions, each which are property of estate in GNI, Genesis-ATC, GTH Group Bankruptcies and in this Bankruptcy Case. Upon information and belief, Defendant actively participated and had knowledge about this obstruction.

103.    Genesis-ATC, the GTH Group, and Defendant concealed, destroyed, mutilated, falsified, or failed to keep or preserve recorded information, including the Endeavor Data, the GTH

Groups' data on NetSuite, and other books, documents, records, and papers regarding Defendant's financial affairs and business transactions. Upon information and belief, Defendant actively participated and had knowledge about this obstruction.

104.    Genesis-ATC, the GTH Group, and Defendant withheld from Seidel, Rea, Northrup, Williams, and the Chapter 7 Trustee the Endeavor Data, the GTH Groups' data on NetSuite, and other books, documents, records, and papers regarding Defendant's financial affairs and business transactions. Upon information and belief, Defendant actively participated and had knowledge about this obstruction.

105.    In the Bankruptcy Case, while Defendant listed San Antonio Spurs tickets in the First Schedules, Defendant's bank statements showed that he had obtained a refund of those tickets and used the refund proceeds post-petition. The Chapter 7 Trustee then made a demand on Defendant, and Defendant paid the Chapter 7 Trustee the amount of the refund.

106.    Defendant's bank account at Bank of America showed that he zeroed out this account on March 22, 2022, and that the remaining balance of $371,000 was transferred to a Sofi account in Defendant's name. Defendant did not disclose a Sofi Account on his First Schedules.

107.    Upon information and belief, FSCLE informed the Chapter 7 Trustee regarding the transfer, and he made a demand on Defendant. In response, Defendant produced two bank statements for his Sofi account for March and April 2022. The March bank statement showed that Defendant transferred $371,000.00 into the Sofi account on March 22, 2022. The April bank statement included a "Miscellaneous Debit" of $371,134.83 on April 19, 2022.

108.    Upon information and belief, Defendant has not produced any records showing what happened to this balance, and the funds previously in the Sofi account have not been turned over to the Chapter 7 Trustee.

109.    On January 27, 2025, the Chapter 7 Trustee adjourned the 341 Meeting of Creditors to February 21, 2025, pending the receipt of additional information.

110.    On February 14, 2025, Defendant filed amended Schedules A/B & C (First Amended Schedules) and an amended Statement of Financial Affairs (First Amended SoFA). Dkt. # 157.

111.    Before filing the First Amended Schedules and First Amended SoFA, Defendant signed the First Amended Schedules and First Amended SoFA declaring under penalty of perjury that he had read the answers to the questions therein and that they were true and correct.

112.    Defendant disclosed on the First Amended Schedules for the first time Defendant's interest in GDMN 2 as 50% and valued at $0 but did not disclose any interest in GDMN 1, GDMN 3, GDMN GP, or GDMN LP.

113.    Defendant also disclosed on the First Amended SoFA for the first time Defendant's Sofi account. The disclosure showed an ending balance of $371,134.83. Defendant has not disclosed what happened to this balance and no documents have been produced related thereto.

114.    On February 18, 2025, Defendant filed an amended Statement of Financial Affairs (Second Amended SoFA). Dkt. # 160.

115.    Before filing the Second Amended SoFA, Defendant signed the Second Amended SoFA declaring under penalty of perjury that he had read the answers to the questions therein and that they were true and correct.

116.    On February 21, 2025, the Chapter 7 Trustee adjourned the 341 Meeting of Creditors to March 21, 2025, pending the receipt of additional information.

117.    On March 21, 2025, the Chapter 7 Trustee adjourned the 341 Meeting of Creditors to April 24, 2025, pending the receipt of additional information.

118.    On March 26, 2025, Defendant filed an amended Schedule A/B and an amended Summary of Schedules (Second Amended Schedule A/B). Dkt. # 170.

119.    Before filing the Second Amended Schedule A/B, Defendant signed the Declaration Concerning Debtor's Schedules declaring under penalty of perjury that he had read the Second Amended Schedule A/B and that it was true and correct.

120.    On March 27, 2025, Defendant filed an amended Schedule A/B (Third Amended Schedule A/B) (collectively with the Initial Schedules, First Amended Schedules, Second Amended Schedule A/B, the Schedules). Dkt # 172.

121.    Before filing the Third Amended Schedule A/B, Defendant signed the Declaration Concerning Debtor's Schedules declaring under penalty of perjury that he had read the Third Amended Schedule A/B and that it was true and correct.

20

122.    On April 21, 2025, the Chapter 7 Trustee adjourned the 341 Meeting of Creditors to April 25, 2025.

123.    On April 25, 2025, the Chapter 7 Trustee held and concluded the 341 Meeting of Creditors.

124.    Upon information and belief, Defendant has not produced records regarding GDMN 2, CSL, GBE, or the GTH Group.

125.    Upon information and belief, Defendant has neither identified bank accounts nor produced bank records for any bank accounts of GDMN 2, CSL, GBE, or the GTH Group.

126.    Upon information and belief, Defendant and James are cooperating to conceal, destroy, falsify, or fail to keep or preserve recorded information, including books, documents, records, and papers, from which Defendant's, GNI's, the GTH Groups' and Genesis-ATC's financial condition or business transactions might be ascertained.

## ALLEGATIONS REGARDING FAILURE TO DISCLOSE OWNERSHIP INTERESTS IN BUSINESSES AND MAINTAIN RECORDS

127.    Upon information and belief, in April 2019, Defendant formed, owned, and controlled GDMN 2.

128.    As of September 2019, GDMN 2 owned 13.5% of the common stock and 32.5% of the Series A-1 Preferred Stock in GNI.

129.    Upon information and belief, on February 9, 2021, Defendant transferred $50,000 to GDMN 2.

130.    Upon information and belief, on February 26, 2021, Defendant transferred $50,000 to GDMN 2.

131.    Upon information and belief, on April 1, 2021, Defendant transferred $50,000 to GDMN 2.

132.    Upon information and belief, on May 7, 2021, Defendant transferred $50,000 to GDMN 2.

133.    Upon information and belief, on May 10, 2021, Defendant transferred $150,000 to GDMN 2.

134.  Upon information and belief, on September 2, 2021, Defendant transferred $12,000 to GDMN 2.

135.  Upon information and belief, on September 3, 2021, Defendant transferred $35,000 to GDMN 2.

136.  Upon information and belief, on October 4, 2021, Defendant transferred $50,000 to GDMN 2.

137.  Upon information and belief, on November 8, 2021, Defendant transferred $50,000 to GDMN 2.

138.  Upon information and belief, on or about November 2021, Defendant caused GDMN 2 to contribute shares in GNI to JJCP (controlled by James and/or Jake), being 452,116 shares of common stock and 487,155 shares of Series A-1 Preferred Stock.

139.  Upon information and belief, after this transfer, Defendant through GDMN 2 owned 1,711,607 common shares (6.415%) in GNI and 2,087,171 shares of the Series A-1 Preferred Stock (26.394%) in GNI.

140.  Upon information and belief, on December 7, 2021, Defendant transferred $50,000 to GDMN 2.

141.  Upon information and belief, on January 4, 2022, Defendant transferred $50,000 to GDMN 2.

142.  Upon information and belief, on February 2, 2022, Defendant transferred $60,000 to GDMN 2.

143.  Upon information and belief, on March 2, 2022, Defendant transferred $53,000 to GDMN 2.

144.  Upon information and belief, on or about March 9, 2022, Defendant caused GDMN 2 to sell 2,574,326 shares of Series A-1 Preferred Stock in GNI to 18920 NW 11th, LLC (18920). The purchase price was $4.05 per share, which valued the sold shares at $10,435,855.

145.  As of the Petition Date, the Texas Secretary of State and the Texas Comptroller of Public Accounts showed that Defendant was the sole member of GDMN 2.

146.  Defendant did not disclose any interest in GDMN 1, GDMN 2, GDMN 3, GDMN GP, or GDMN LP in the First Schedules.

147. Upon information and belief, after Defendant filed the First Schedules, FSCLE notified the Chapter 7 Trustee that GDMN 2, which was a material participant in the racketeering activity in the RICO Case, was not disclosed by Defendant.

148. On September 30, 2024, the Chapter 7 Trustee filed a Motion to Compel Turnover of Property of the Estate, which requested Defendant turnover documents related to GDMN 2. Dkt. # 70.

149. On November 17, 2024, the Chapter 7 Trustee filed a Witness and Exhibit List that attached public filings related to GDMN 2, which show Defendant as the sole owner of GDMN 2. Dkt. # 117.

150. On February 14, 2025, Defendant filed the Second Amended Schedules that disclosed for the first time Defendant's interest in GDMN 2 as 50% and valued at $0.

151. Defendant did not disclose any interest in GDMN 1, GDMN 3, GDMN GP, or GDMN LP in the Second Amended Schedules.

152. Defendant knowingly and fraudulent made a false oath when he failed to disclose his ownership interest in GDMN 1, GDMN 3, GDMN GP, or GDMN LP on his First Schedules, First Amended Schedules, Second Amended Schedules, and Third Amended Schedules.

153. Defendant has not explained why the public records with the Texas Secretary of State and the Texas Comptroller of Public Accounts show him as the sole owner while his Schedules show him as 50% owner.

154. Defendant knowingly and fraudulent made a false oath when he failed to disclose his ownership interest in GDMN 2 on his First Schedules.

155. Defendant knowingly and fraudulent made a false oath when he failed to disclose his ownership interest in GDMN 2 on his First Amended Schedules.

156. Defendant knowingly and fraudulent made a false oath when he failed to disclose his 100% ownership interest in GDMN 2 on his Second Amended Schedules.

157. Defendant knowingly and fraudulent made a false oath when he failed to disclose his 100% ownership interest in GDMN 2 on his Third Amended Schedules.

158. Defendant failed to explain satisfactorily what he and GDMN 2 did with the $10,435,855 it received from 18920.

23

159.     Defendant concealed, destroyed, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which GDMN 2's financial condition or business transactions might be ascertained.

## ALLEGATIONS CONCERNING DEFENDANT'S TRANSFER, REMOVAL, OR CONCEALMENT OF PROPERTY WITHIN ONE YEAR BEFORE THE PETITION DATE AND AFTER THE PETITION DATE

160.     Upon information and belief, Defendant with intent to hinder, delay, or defraud a creditor or the Chapter 7 Trustee, transferred or permitted to be transferred or removed Defendant's property within one year before the date of the filing of the petition.

161.     Upon information and belief, Defendant with intent to hinder, delay, or defraud a creditor or the Chapter 7 Trustee, transferred or permitted to be transferred or removed property of the estate after the date of the filing of the petition.

162.     Defendant intentionally caused thousands of dollars and real property to be transferred to or for the benefit of JAG-1, JAG-2, and Piel before filing his bankruptcy petition to remove them as an asset of the estate with the intent to delay or defraud a creditor or an officer of the estate.

163.     In December 2018, AT&T made the indemnity demand on the Genesis Companies.

164.     Thereafter, Defendant would utilize the Trusts to shield assets that might otherwise be exposed to liabilities that would result from the AT&T Arbitration Award and prepare for filing his individual bankruptcy.

*A.  The Bryan Property*

165.     On or about November 4, 2022, Defendant transferred $450,000 from a GNI bank account to his personal Wells Fargo bank account ending in *8690.

166.     Upon information and belief, on or about December 2, 2022, Defendant purchased real property commonly known as 2852 Persimmon Ridge Ct. in Bryan, Texas (Bryan Property) for $759,920.

167.     Upon information and belief, the purchase was funded by $160,000 that was transferred from Defendant's Wells Fargo bank account ending in *8690 and by a loan taken out from American Federal Mortgage Corp. in the amount of $599,920.

168.     Upon information and belief, Defendant and Cayenne always have been co-trustees of the Trusts, but Defendant primarily controlled and managed the Trusts.

169.     On or about May 2, 2023, Defendant executed a general warranty deed transferring the Bryan Property to the JAG-1 Trust for no consideration.

170.     Upon information and belief, on May 2, 2023, Defendant emailed his attorney, Bruce Newsome at Haynes and Boone under the subject line "FedEx" and asked "did Woodforest ever send you the signed and notarized documents for the warranty deed for my daughters trust?"

171.     On or about October 13, 2023, Defendant executed a purported Correction General Warranty Deed that claimed to give JAG-1 the right to use and occupy the Bryan Property and claim it as her homestead.

172.     Upon information and belief, Defendant has at all times paid or caused to be paid the expenses, including mortgage and HOA fees, for the Bryan Property.

173.     Defendant with intent to hinder, delay, or defraud his creditors transferred the Bryan Property to the JAG-1 Trust.

174.     Defendant with intent to hinder, delay, or defraud his creditors used property of the debtor to pay expenses for the Bryan Property within one year before the date of the filing of the petition.

### B.  The Port Aransas Property

175.     On or about December 15, 2022, Defendant and Cayenne, through the JC Trust, purchased real property commonly known as Cinnamon Shore South Unit 5 at 701 Coastline Drive in Port Aransas, Texas (Port Aransas Property) for $575,000.

176.     Upon information and belief, the purchase price was funded by $124,357 that was transferred from Defendant's Wells Fargo bank account ending in *8690, additional cash transferred by Defendant individually, and by a loan taken out from U.S. Bank in the amount of $402,500.

177.     On or about November 8, 2023, Defendant executed as grantors a special warranty deed transferring the Port Aransas Property to the JAG-2 Trust for no consideration.

178.     Defendant with intent to hinder, delay, or defraud his creditors caused the Port Aransas Property to be transferred to the JAG-2 Trust within one year before the date of the filing of the petition.

179.     On or about August 29, 2024, Defendant, acting as trustee for the JAG-2 Trust and without providing notice to the Chapter 7 Trustee, caused the Port Aransas Property to be sold for $580,000 and distributed $133,233 in unencumbered proceeds to the JAG-2 Trust.

180.     Upon information and belief, Defendant has at all times paid or caused to be paid the expenses, including mortgage and HOA fees, for the Port Aransas Property.

181.     Defendant with intent to hinder, delay, or defraud his creditors and the Chapter 7 Trustee caused the Port Aransas Property to be transferred after the date of the filing of the petition.

182.     Defendant with intent to hinder, delay, or defraud his creditors and the Chapter 7 Trustee caused the Port Aransas Property to be transferred knowing that he would attempt to exclude these proceeds from his estate and its creditors as separate trust property.

*C.  The Middle Creek Property*

183.     In December 2015, the JC Trust purchased 11.673 acres of real property commonly known as 1008 Middle Creek Road, Fredericksburg, Texas (the Middle Creek Property) for use as Defendant's residence.

184.      Upon information and belief, Defendant caused a substantial amount of personal funds to be expended toward the Middle Creek Property for substantial improvements to the 6,400 square foot main house with six bedrooms and five bathrooms and exterior improvements that include a baseball field and batting cages, a basketball court, a detached airconditioned three car garage, a 2,300 square foot two-bedroom, two-bathroom guest house with full amenities and a media room, a pool with self- described "grotto" and hot tub, a large cabana with a fireplace and full bathroom and grill and bar, a fire pit, a fully equipped gym, a chicken coop, a craft shop, a large workshop, a pond, gated entry, and extensive landscaping.

185.     Upon information and belief, many of the above-described improvements have been made since October 2021 when the Goodman Brothers and Frinzi began to defraud FSCLE.

186.     On November 22, 2021, Defendant transferred $15,000 to Gillespie County. Upon information and belief, this transfer was for property taxes on the Middle Creek Property.

187.     Between April 2023 and September 2023, Defendant caused substantial home improvements to be made to the Middle Creek Property, including the installation of new windows and doors and at least $24,188.23 paid for landscaping. Upon information and belief, Defendant

caused additional improvements to be made to the Middle Creek Property from his personal funds since July 2023.

188.    On August 23, 2023, Defendant caused the JC Trust to enter into a $1,867,316 note with Prosperity Bank on the Middle Creek Property. Defendant set up automated payments from his personal bank account of $12,000 to repay this debt to Prosperity Bank. These automated payments were made by Defendant between August 2023 and March 2024. Upon information and belief, these payments were made primarily from funds Defendant obtained from the GTH Group for "payroll."

189.    Defendant with intent to hinder, delay, or defraud creditors and the Chapter 7 Trustee used personal funds to make improvements to and pay a loan on the Middle Creek Property within one year before the petition date knowing that he would claim it as his homestead exemption and that Texas provides an unlimited amount for the homestead exemption.

190.    Defendant caused the Middle Creek Property to be put in the JC Trust with intent to hinder, delay, or defraud his creditors and eventually an officer of the estate.

*D.  The Sandpoint Properties*

191.    On or about January 2019, Defendant, through the JAG-2 Trust, purchased real property commonly known as 3320 North Kootenai Rd., Sandpoint, Idaho (the Kootenai Property) for $275,000.

192.    On or about December 2019, Defendant, through the JAG-1 Trust, purchased real property commonly known as Vintage Court Suites 200, 201, 202 at 102 S. 1st Avenue in Sandpoint, Idaho (the Vintage Court Properties, and collectively with the Kootenai Property the Sandpoint Properties).

193.    On February 18, 2022, Defendant spent $27,441.67 on HVAC repairs at one of the Sandpoint Properties by paying Trademark Heating, Colling & Electrical in Hayden, ID.

194.    On or about April 15, 2024, Defendant transferred $7,057 to JAG-1 Trust, who then used the funds to pay HOA fees for property Defendant transferred into the Trusts.

195.    Upon information and belief, Defendant used the Sandpoint Properties for his own personal use.

196.    Upon further information and belief, Defendant with intent to hinder, delay, or defraud creditors and the Chapter 7 Trustee used personal funds to make improvements to and pay a loan on the Sandpoint Properties within one year before the petition date.

197.    Defendant caused the Sandpoint Properties to be put in the Trusts with intent to hinder, delay, or defraud his creditors and eventually an officer of the estate.

E.    *The E. San Antonio Property*

198.    In February 2021, Defendant, through the JAG-1 and JAG-2 Trusts d/b/a Soni Properties, purchased 2.52 acres of real property commonly known as 618-620 E. San Antonio in Fredericksburg, Texas (E. San Antonio Property).

199.    Upon information and belief, the purchase price was funded by a loan from Security State Bank & Trust in an amount equal to $1.1 million and by $11,248.90 paid personally by Defendant.

200.    Upon information and belief, Defendant personally guaranteed the loan and paid the escrow amount of $8,500 for the E. San Antonio Property.

201.    Defendant caused the E. San Antonio Property to be put in the Trusts with intent to hinder, delay, or defraud his creditors and eventually an officer of the estate.

202.    On December 9, 2021, and January 20 and 31, 2022, Defendant personally transferred $31,500 to J&J Construction. Upon information and belief, J&J Construction is a general contractor that specialized in home improvement services near Fredericksburg, Texas, that provided services that benefited the E. San Antonio Property.

203.    Upon information and belief, on January 27 and 28, 2022, Defendant personally transferred $57,480.75 to Ingram Ready Mix for the pouring of a concrete footer at the E. San Antonio Property.

204.    On January 31, 2022, Defendant personally transferred $5,990.60 to AM Concrete. Upon information and belief, AM Concrete provided services that benefited the E. San Antonio Property.

205.    On or about March 9, 2022, Defendant caused the JAG-1 Trust to transfer $210,195.85 from the Security State Bank & Trust loan for Defendant's personal use.

206. On or about March 10, 2023, Defendant, through JAG-1 and JAG-2 Trusts d/b/a Soni Properties, borrowed $500,000 from Security State Bank & Trust secured by the E. San Antonio Property and personally guaranteed by Defendant.

207. On or about March 13, 2023, another deed of trust evidencing that Security State Bank & Trust held a lien on E. San Antonio Property was filed in Gillespie County, Texas.

208. On or about June 22, 2023, Defendant borrowed $780,000 from Randy Bennett and granted a lien to Randy Bennett on the E. San Antonio Property.

209. On or about October 2, 2023, Defendant, through JAG-1 and JAG-2 Trusts d/b/a Soni Properties, borrowed $440,000 from Matthew Mabery secured by the E. San Antonio Property (Mabery Deed of Trust).

210. Upon information and belief, Defendant executed the Mabery Deed of Trust in his capacity as co-trustee of the JAG-1 Trust and JAG-2 Trust, but the Mabery Deed of Trust provides that Defendant was the borrower in his individual capacity.

211. Upon information and belief, the Trusts did not receive any funds relating to the Mabery Deed of Trust.

212. On or about October 4, 2023, Defendant, through JAG-1 and JAG-2 Trusts d/b/a Soni Properties, borrowed $780,000 from Randy Bennett secured by the E. San Antonio Property (Bennett Deed of Trust).

213. Upon information and belief, Defendant executed the Bennett Deed of Trust in his capacity as co-trustee of the JAG-1 Trust and JAG-2 Trust, but the Bennett Deed of Trust provides that Defendant was the borrower in his individual capacity.

214. Upon information and belief, the Trusts did not receive any funds relating to the Bennett Deed of Trust.

215. Defendant, using his personal bank account, transferred at least $985,778.76 to Security State Bank & Trust for the loan and a substantial portion of that was within 1 year of Defendant's Petition Date.

216. Upon information and belief, Defendant caused the prior residences at the E. San Antonio Property to be torn down, he constructed a retaining wall, infilled the site, and obtained commercial zoning for the property at substantial personal expense.

217.    Upon information and belief, Defendant caused additional improvements to be made to the E. San Antonio Property from his personal funds since July 2023.

218.    Defendant with intent to hinder, delay, or defraud creditors and the Chapter 7 Trustee used personal funds to make improvements to E. San Antonio Property within one year before the petition date knowing that he would attempt to exclude it from his estate as separate trust property.

*F.  Vehicles*

219.    On January 13, 2022, Defendant paid $54,600 to Fifth Third Bank to pay off the loan on a 2021 Ford Bronco.

220.    On January 18, 2022, Defendant paid $16,400 to David Tripp for the purchase of the 2021 Ford Bronco.

221.    On December 17, 2021, and January 18, 2022, Defendant Spent $13,946.16 at Xtreme Outfitters. Upon information and belief, Xtreme Outfitters is based in Kerrville, Texas, and provides truck accessories and improvements, and this money was spent on the 2021 Ford Bronco.

222.    Subsequently, upon information and belief, Defendant caused the 2021 Ford Bronco to be contributed to the JAG-1 Trust for no consideration.

223.    Upon information and belief, Defendant used his own funds to make installment payments on the 2021 Ford Bronco.

224.    Defendant caused the 2021 Ford Bronco to be put in the Trusts with intent to hinder, delay, or defraud its creditors and an officer of the estate.

225.    Upon information and belief, the JAG-2 Trust owns a 2023 F-150 Ford Truck.

226.    Upon information and belief, Defendant's funds were used to purchase the 2023 F-150 Ford Truck owned by the JAG-2 Trust.

227.    Subsequently, upon information and belief, Defendant caused the 2023 F-150 Ford Truck to be contributed to the JAG-2 Trust for no consideration.

228.    Upon information and belief, Defendant used his own funds to make installment payments on the 2023 F-150 Ford Truck.

229.    Defendant caused the 2023 F-150 Ford Truck to be put in the Trusts with intent to hinder, delay, or defraud its creditors and an officer of the estate.

30

### G. Life Insurance Policies

230.    In the First Schedules, Defendant identified a generic "$2,000,000 term life policy" that names as beneficiaries the JAG-1 and JAG-2 Trusts (JAG Policy).

231.    Upon information and belief, Defendant also caused a life insurance policy to be taken out for Piel (Piel Policy). Defendant has not disclosed the Piel Policy on the Schedules.

232.    From at least September through November 2022, Defendant, through G2 Construction Services, Inc., made premium payments to Freedom Life Insurance Company of America for the Piel Policy.

233.    Upon information and belief, Defendant paid the premiums for the JAG Policy and the Piel Policy.

234.    On September 1, 2023, Defendant personally received a $19,450 transfer from Transamerica Life Insurance Company. Upon information and belief, this was the cash value of the JAG Policy.

235.    Defendant with intent to hinder, delay, or defraud creditors and the Chapter 7 Trustee took out the life insurance policies and named the Trusts and Piel as beneficiaries knowing that he would attempt to shield these assets from creditors and the Chapter 7 Trustee through exemptions and by attempting to exclude the Trust property as property of the estate.

### H. Outlaw Gaming

236.    Upon information and belief, in November 2021, Defendant and Scott Pickett, an employee of Defendant's at GTH, invested in Outlaw Inc., a Panama company based in Dubai, United Arab Emirates, which was intended to issue crypto tokens in Outlaw Game Partner or OTLW.

237.    On November 5, 2021, Defendant transferred $230,000 to Cowboy Crypto for his investment in Outlaw. Defendant has not disclosed ever having an investment at Cowboy Crypto and no statements have been produced from this account. Instead, Defendant disclosed in the First Schedules a $270,000 investment in Outlaw.

238.    Defendant invested in crypto to shield assets that might otherwise be exposed to liabilities to FSCLE that would result from fraudulent schemes.

239.     Defendant, Pickett, and others communicated regarding Outlaw Inc. through WhatsApp. Upon information and belief, Defendant set these WhatsApp chats to delete automatically and did not preserve them.

240.     Defendant caused the documentation for Picket related to Outlaw to be produced to the Chapter 7 Trustee but stated "[Defendant] can't locate his."

241.     Defendant failed to keep or preserve the recorded information, including books, documents, records, papers, and emails, which FSCLE or the Chapter 7 Trustee might ascertain Defendant's financial condition or business transactions with Outlaw. The lack of documentation is intended to conceal Defendant's loss of assets and his business transactions.

## ALLEGATIONS CONCERNING DEFENDANT'S FAILURE TO EXPLAIN SATISFACTORILY THE LOSS OF ASSETS TO MEET HIS LIABILITIES

242.     Defendant failed to explain satisfactorily the loss of assets or deficiency of assets to meet Defendant's liabilities.

243.     On November 15, 2021, Defendant transferred $3,000 to an unknown Venmo account.

244.     On November 22, 2021, Defendant purchased tickets for $2,363.28 at Stubhub.com.

245.     On November 23 and 24, 2021, Defendant spent $3,845.27 at the La Velencia Hotel in La Jolla, CA.

246.     On December 13, 2021, Defendant transferred $47,548.47 to an unknown transferee.

247.     On December 14 and 15, 2021, Defendant paid off credit cards totaling $140,488.28.

248.     On December 27, 2021, Defendant transferred $22,752 to GBE.

249.     On January 13, 2022, Defendant spent $21,900 on tickets from TicketEvents.com.

250.     On January 14, 2022, Defendant spent $10,750 for spa services in San Antonio.

251.     On January 28, 2022, Defendant transferred $26,270 to Threshold Ventures, Inc. Upon information and belief, Threshold Ventures is venture capital fund. Defendant has not

disclosed ever having an investment at Threshold Ventures and no statements have been produced from this account.

252. On January 31, 2022, Defendant spent $3,207.74 for hotel accommodations at the Mokara Hotel & Spa in San Antonio.

253. On January 31, 2022, Defendant spent $2,164.90 on home furnishings at Williams Sonoma.

254. On January 31, 2022, Defendant spent $1,017.13 on a VRBO rental in Texas.

255. On February 2, 2022, Defendant transferred $9,130.78 to Curbell Plastics, in Orchard Park, NY.

256. On or about February 7 and March 2, 2022, Defendant transferred $30,000 to Vincent Adebasiku at the Barclays Bank of Uganda.

257. On February 7, 8, and 15, 2022, Defendant spent $3,477.60 on baseball consulting for JAG-2 at Perfect Game Inc.

258. On February 11 and 14, 2022, Defendant spent $6,199.56 at the Bellagio in Las Vegas, NV. While at the Bellagio, he transferred $4,000 to an unknown Venmo account, and $944 to Draft Kings.

259. On February 16, 2022, Defendant withdrew $15,000 from a joint bank account maintained by Defendant and Cayenne at JP Morgan Chase Bank ending in 4791 (4791 Account).

260. On February 23, 2022, Defendant spent $10,000 on airfare from New Orleans to Venice, Louisiana on Rotorcraft Leasing Company. While in Venice, LA, Defendant transferred $2,600 to an unknown Venmo account, $2,678 to Blue Water Unlimited, and $283.69 to Venice Marine. Upon information and belief, these charges were for a fishing trip.

261. On February 25, 2022, Defendant spent $3,080 for spa services in San Antonio.

262. On or about March 21, 2022, Defendant transferred $10,000 to Saltwater Endeavors, LLC.

263.     From July 8 to July 11, 2022, Defendant traveled to St. Thomas in the United States Virgin Islands. During his time in St. Thomas, he made the following transfers:

> a. $25,000 to Cayenne.
>
> b. $50,000 to GDMN 2.
>
> c. $75,000 to Merlin One Aircraft LLC.
>
> d. $21,782 to BCG Capital Partners, Inc.
>
> e. $150,000 to High Street Holdings, LLC.
>
> f. $6,443 to Havel & Partners S.R.O, a Czech Law firm.

264.     On or about May 22, 2023, Defendant received $440,000 and immediately caused $363,000 to be transferred to International Party Marketing, LLC.

265.     On or about June 23, 2023, Defendant received $780,000 and within a week transferred most of these funds to: (A) $363,000 to an unknown person or bank account; (B) $20,781 to the Trusts, and (C) $360,000 to an unknown Coinbase account.

266.     On or about August 29, 2023, Defendant received $487,093 and within the next ten days transferred most of the funds to third parties, including: (A) $90,000 to the JAG-2 Trust; (B) $24,000 to Capital Partners; and (C) numerous unidentified recipients.

267.     On August 31, 2023, Defendant transferred $24,500 to Ally Lending as a loan payoff.

268.     On or about September 15, 2023, Defendant received $201,263 and within the next month transferred most of the funds to third parties, including: (A) $5,000 to the Soni Trust; (B) $40,900 to JAG-1 Trust; and (C) numerous unidentified recipients.

269.     On December 22, 2023, Defendant transferred $12,000 to Prosperity Bank.

270.     On February 1, 2024, Defendant transferred $12,000 to Prosperity Bank.

271.     On or about February 13, 2024, Defendant opened a bank account at Applied Bank. From February 13 to March 26, 2024, Defendant received at least $505,125 and within the next month transferred most of the funds to third parties, including (A) $22,692 to Prosperity Bank and (B) numerous unidentified recipients.

272.     On February 13, 2024, Cayenne filed for divorce from Defendant. Yet, after the divorce, Defendant and Cayenne continued to travel together and Defendant caused many transfers to Cayenne.

273. In the four months leading up to the Petition Date, Defendant made at least the following transfers to Cayenne:

March 21, 2024 - $6,525;
March 27, 2024 - $3,000;
March 27, 2024 - $357.05;
April 2, 2024 - $27,000;
April 5, 2024 - $2,000;
April 12, 2024 - $1,300;
April 15, 2024 - $2,000;
April 16, 2024 - $2,000;
April 18, 2024 - $395;
April 22, 2024 - $260;
April 29, 2024 - $2,000;
May 1, 2024 - $1,000;
June 21, 2024 - $1,000;
July 5, 2024 - $200; and
July 8, 2024 - $1,000.

274. Upon information and belief, there is no support order requiring Defendant to make support payments to Cayenne.

275. In March 2024, Defendant took personal trips to Port Aransas, Texas, Bryan, Texas, and Buchanan Lake Village, Texas.

276. On March 11 and 14, 2024, Defendant transferred $2,850 to an unidentified "Erica".

277. From April 1 to April 3, 2024, Defendant traveled to Grand Cayman. While in Grand Cayman, he spent at least $46,614.30 for hotel, entertainment, and airfare. Upon information and belief, this was either a pleasure trip or a business trip used to conceal assets. Cayenne traveled with him.

278. On April 15, 2024, Defendant transferred $6,500 to an unknown recipient.

279. On April 22, 2024, Defendant transferred $5,181.32 to an unknown recipient.

280. On April 23, 2024, Defendant transferred $2,000 to an unknown recipient.

281. From May 6 to May 10, 2024, Defendant traveled to Grand Cayman. Defendant spent at least $4,845.02 on hotels, airfare, and entertainment. While in Grand Cayman, he transferred $13,000 to Alena Basumatarava. Upon information and belief, this was either a pleasure trip or a business trip used to conceal assets.

282. On May 29, 2024, Defendant transferred $1,600 to an unknown Robert Celotto.

35

283.    In June 2024, Defendant took personal trips to Bryan, Texas, Los Angeles, California, Cinnamon Shore, Texas, and Port Angeles, Washington. Upon information and belief, Cayenne traveled with him to Port Angeles, Washington.

284.    In July 2024 before the Petition Date, Defendant took a personal trip to Port Aransas, Texas.

285.    The day before the Petition Date, Defendant purchased $738.71 in clothes at Lululemon.

286.    After the Petition Date, Defendant spent $873.45 of the $909.11 in the Chase Account listed in his Schedules.

287.    These transfers have not been satisfactorily explained. Upon information and belief, they were fraudulent transfers meant to conceal assets and keep FSCLE, other creditors, and the Chapter 7 Trustee from ascertaining Defendant's financial condition and his business transactions.

a.    *JOKER*

288.    Defendant formed Joker and was its sole member on or about December 27, 2019.

289.    In January 2021, during the AT&T Arbitration, Defendant caused Joker to purchase a 1993 Dassault Breguet Falcon 50, a super-midsize, long-range business jet (the Joker Jet).

290.    Upon information and belief, the Goodman Brothers used the Joker Jet as their private luxury airplane for personal travel.

291.    Upon information and belief, Defendant allowed the Joker Jet to be used to facilitate the business transactions of alleged by FSCLE in the RICO Complaint.

292.    Defendant caused Joker to open a Wells Fargo bank account ending in 4123 (the Joker Bank Account) on or about February 26, 2021.

293.    Upon information and belief, Defendant caused numerous cash transfers for his benefit to be directed to the Joker Bank Account and then redirected in manners intended to conceal assets and keep creditors from ascertaining Defendant's financial condition and business transactions.

294.    From February 2021 to September 2022, Defendant caused GTH and GTS to transfer $1,503,636 to the Joker Bank Account, including the following transfers:

   a.    On or about February 26, 2021, Defendant received $176,287 into the Joker Bank Account and caused $125,000 of it to be transferred to JAG-2 Trust.

    b.   On or about March 11, 2021, Defendant caused GTS to transfer $178,252 to the Joker Bank Account and then caused $41,000 to be transferred to the JAG-2 Trust and $18,000 to be transferred to Cayenne.

    c.   On or about May 17, 2021, Defendant caused GTS to transfer $200,000 to the Joker Bank Account and then caused $50,000 to be transferred to him personally.

295.    On or about December 2021, Defendant caused Joker to sell the Joker Jet, and Aero-Space Reports Inc. transferred $956,705 to the Joker Bank Account as the proceeds of this sale.

296.    In May 2022, Defendant caused the Joker Bank Account to make a series of transfers to facilitate his personal travel to the Bahamas by private jet. The Joker Bank Account made the following transfers: (A) $147,275 to Merlin One Aircraft LLC; (B) $35,000 to Miami Habitat; (C) $12,874 to an unknown recipient; and (D) $33,109 to Air 7 LLC. Upon information and belief, this was either a business trip used to conceal assets or a private vacation. Upon information and belief, they were fraudulent transfers meant to conceal assets and keep FSCLE and other creditors from ascertaining Defendant's financial condition and business transactions.

297.    While in the Bahamas, Defendant caused the Joker Bank Account to transfer $250,000 to Cala II LLC.

298.    From June 2022 until the Joker Account was zeroed out in August 2023, Defendant transferred at least $569,222 to the Joker Bank Account.

299.    From July to September 2022, Defendant caused the Joker Account to transfer him personally $370,000.

300.    Upon information and belief, the transfers in paragraphs 243 to 299 were meant to conceal assets and keep creditors from ascertaining Defendant's financial condition and business transactions.

301.    Defendant failed to explain satisfactorily the loss of assets or deficiency of assets in paragraphs 243 to 299 to meet Defendant's liabilities.

302.    Defendant failed to disclose income from Joker in 2022 on SoFA Question No. 4.

## ALLEGATIONS CONCERNING DEFENDANT'S FAILURE TO DISCLOSE AND PROVIDE INFORMATION REGARDING BANK ACCOUNTS

303.    Defendant and Cayenne maintained joint bank accounts at JP Morgan Chase Bank ending in 1283 (1283 Account) and the 4791 Account.

304.    Schedules A/B, Part 4, Item 17 requires the disclosure of certificates of deposit. Defendant and Cayenne also maintained a certificate of deposit ending in 9151 (9151 Account). Defendant did not disclose the 9151 Account certificate of deposit in his Schedules.

305.    As of March 31, 2024, the 4791 Account, the 1283 Account, and the 9151 Account had a collective balance of $2,406.19.

306.    Defendant has not produced bank statements from these accounts for the period between March 31, 2024, through the Petition Date.

307.    Defendant did not disclose the 1283 Account in his Schedules.

308.    In the year prior to the Petition Date, online transfers were made between the 4791 Account and other JP Morgan Chase Bank accounts ending in 3774, 3634, 1435, 2679, and 2771. None of these accounts are identified in the Schedules and no documents related to these accounts have been produced by Defendant.

309.    Defendant listed in his Schedules a generic "Checking account (separated spouse's sole management community property, including support payments) (not property of the debtor's estate)" for an "unknown" amount. Defendant has not produced any records or documentation for this bank account and neither creditors or the Chapter 7 Trustee can ascertain Defendant's interest in this bank account.

310.    Defendant scheduled a generic "Other financial account coinbase" with $1.22 in his Schedules. Defendant caused transfers into a Coinbase account, including the following: November 12, 2021 - $1,000; January 19, 2022 - $5,000; June 23, 2023 - $360,000. Plaintiff requested Defendant provide complete copies of transaction logs for this account for the period of January 1, 2021, through the date of response. Defendant has not produced any records or documentation for this account and there is no way for creditors, Plaintiff, or the Chapter 7 Trustee to ascertain Defendant's business transaction from this account.

311.    Defendant scheduled a generic "Other financial account Paypal" with $0.00 in his Schedules. Plaintiff requested Defendant provide complete copies of transaction logs for this

account for the period of January 1, 2021, through the date of response. Defendant has not produced any records or documentation for this account and there is no way for creditors, Plaintiff, or the Chapter 7 Trustee to ascertain Defendant's business transaction from this account.

312.    Defendant scheduled a generic "Other financial account Cash app" with $0.00 in his Schedules. Plaintiff requested Defendant provide complete copies of transaction logs for this account for the period of January 1, 2021, through the date of response. Defendant has not produced any records or documentation for this account and there is no way for creditors, Plaintiff, or the Chapter 7 Trustee to ascertain Defendant's business transaction from this account.

313.    Defendant scheduled a generic "Other financial account Venmo" with $0.00 in his Schedules. Plaintiff requested Defendant provide complete copies of transaction logs for this account for the period of January 1, 2021, through the date of response. Defendant has not produced any records or documentation for this account and there is no way for creditors, Plaintiff or the Chapter 7 Trustee to ascertain Defendant's business transaction from this account.

## COUNT I
### Denial of Discharge of Defendant
### 11 U.S.C. § 727(a)(2)(A)
### Pre-Petition Transfer, Removal, and Concealment of Property

314.    Plaintiff incorporates by reference the facts and allegations contained in paragraphs 1 through 313.

315.    11 U.S.C. § 727(a)(2)(A) provides that the Court shall deny a debtor a discharge when "the debtor with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated or concealed or has permitted to be transferred, removed, destroyed, mutilated, or concealed property" of the debtor within one year before the date of the filing of the petition.

316.    Plaintiff is informed and believes and thereon alleges that Defendant transferred, removed, and concealed property, including the Port Aransas Property, the Bryan Property, the Middle Creek Property, the Sandpoint Properties, E. San Antonio Property, 2021 Ford Bronco, 2023 F-150 Truck, JAG Policy, Piel Policy, and Outlaw Gaming within one year before the date of filing the petition.

317.    Plaintiff is informed and believes and thereon alleges that Defendant transferred,

removed, and concealed property, including Defendant's cash payments or transfers made for the expenses of the Trusts on the Port Aransas Property, the Bryan Property, the Middle Creek Property, the Sandpoint Properties, E. San Antonio Property, 2021 Ford Bronco, 2023 F-150 Truck, JAG Policy, Piel Policy, and Outlaw Gaming, as well as cash payments or transfers made to Cayenne, the Trusts, and other third parties within one year before the date of filing the petition.

318.    Plaintiff is informed and believes that Defendant "with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated or concealed or has permitted to be transferred, removed, destroyed, mutilated, or concealed property" of Defendant within one year before the date of the filing of the petition.

319.    Therefore, Defendant should be denied his discharge.

## COUNT II
### Denial of Discharge of Defendant
### 11 U.S.C. § 727(a)(2)(B)
### Transfer and Concealment of Estate Assets Post-Petition

320.    Plaintiff incorporates by reference the facts and allegations contained in paragraphs 1 through 319.

321.    11 U.S.C. § 727(a)(2)(B) provides that the Court shall deny a debtor a discharge when "the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed property" of the debtor after the date of the filing of the petition.

322.    Plaintiff is informed and believes and thereon alleges that Defendant concealed his ownership interests in GDMN 1, GDMN 2, GDMN 3, GDMN GP, or GDMN LP.

323.    Plaintiff is informed and believes and thereon alleges that Defendant transferred or permitted the transfer of the Port Aransas Property by the JAG-2 Trust on or about August 29, 2024, and dissipated the proceeds thereof.

324.    Plaintiff is informed and believes and thereon alleges that Defendant "with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated or concealed or has permitted to be

40

transferred, removed, destroyed, mutilated, or concealed property" of Defendant within one year after the date of the filing of the petition.

325.     Therefore, Defendant should be denied his discharge.

### COUNT III
**Denial of Discharge of Defendant**
**Under 11 U.S.C. § 727(a)(3)**
**Failure to Keep or Preserve Books and Records**

326.     Plaintiff incorporates by reference the facts and allegations contained in paragraphs 1 through 325.

327.     11 U.S.C. § 727(a)(3) provides that the Court shall deny a debtor a discharge if "the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure act was justified under all the circumstances of the case."

328.     Plaintiff is informed and believes and thereon alleges that Defendant concealed, destroyed, mutilated, falsified, or failed to keep or preserve documentation from which his financial condition or business transactions might be ascertained.

329.     Defendant's concealment, destruction, falsification, or failure to keep or preserve records from which his financial condition or business transactions is unjustified.

330.     Therefore, Defendant should be denied his discharge.

### COUNT IV
**Denial of Discharge of Defendant**
**11 U.S.C. § 727(a)(4)(A)**
**False Oath**

331.     Plaintiff incorporates by reference the facts and allegations contained in paragraphs 1 through 330.

332.     11 U.S.C. § 727(a)(4)(A) provides that the Court shall deny a debtor a discharge if "the debtor knowingly and fraudulently makes a false oath or account" in connection with the case.

333.     Plaintiff is informed and believes and thereon alleges that Defendant made

numerous false oaths on his Schedules and SoFA, including but not limited to failing to disclose all his assets, income, and transfers.

334.   Plaintiff is informed and believes and thereon alleges that Defendant made numerous false oaths in his testimony at the meetings of creditors, including but not limited to his testimony under oath that the Schedules were true and accurate to the best of his knowledge.

335.   Defendant's false oaths were made knowingly and fraudulently.

336.   Therefore, Defendant should be denied his discharge.

## COUNT V
### Denial of Discharge of Defendant
### 11 U.S.C. § 727(a)(4)(D)
### Withheld Recorded Information from an Officer of the Estate

337.   Plaintiff incorporates by reference the facts and allegations contained in paragraphs 1 through 336.

338.   11 U.S.C. § 727(a)(4)(D) provides that the Court shall deny a debtor a discharge if "the debtor knowingly and fraudulently withheld from an officer of the estate entitled to possession under this title, any recorded information, including books, documents, records, and papers, relating to the debtor's property or financial affairs" in or in connection with the case.

339.   Plaintiff is informed and believes and thereon alleges that Defendant knowingly and fraudulently, in or in connection with this case, withheld from the Chapter 7 Trustee recorded information, including books, documents, records and papers, relating to Defendant's property or financial affairs.

340.   The Chapter 7 Trustee is an officer of the estate entitled to possession of the recorded information relating to Defendant's property or financial affairs.

341.   Therefore, Defendant should be denied his discharge.

## COUNT VI
### Denial of Discharge of Defendant
### Under 11 U.S.C. § 727(a)(5)
### Failure to Satisfactorily Explain Loss or Deficiency of Assets

342.   Plaintiff incorporates by reference the facts and allegations contained in paragraphs 1 through 341.

343. 11 U.S.C. § 727(a)(5) provides that the Court shall deny a debtor a discharge if "the debtor has failed to explain satisfactorily, before determination of denial of discharge under this paragraph, any loss of assets or deficiency of assets to meet the debtor's liabilities."

344. Plaintiff is informed and believes and thereon alleges that Defendant received millions of dollars in the past five years and has not explained satisfactorily the loss of assets or deficiency of assets to meet Defendant's liabilities.

345. Because Defendant failed to explain satisfactorily, before determination of denial of discharge, the loss of assets or the deficiency of assets to meet his liabilities, the Defendant's discharge should be denied.

## COUNT VII
**Denial of Discharge of Defendant**
**Under 11 U.S.C. § 727(a)(6)(A)**
**Refusal to Obey a Lawful Order of the Court**

346. Plaintiff incorporates by reference the facts and allegations contained in paragraphs 1 through 345.

347. 11 U.S.C. § 727(a)(6)(A) provides that the Court shall deny a debtor a discharge if "the debtor has refused in the case to obey any lawful order of the court, other than an order to respond to a material question or to testify."

348. Plaintiff is informed and believes and thereon alleges that Defendant has not provided all the documents requested by the Chapter 7 Trustee as ordered by the Court in the Turnover Order.

349. The Turnover Order did not require Defendant to respond to a material question or to testify.

350. Therefore, Defendant should be denied his discharge.

## COUNT VIII
### Denial of Discharge of Defendant
### Under 11 U.S.C. § 727(a)(7) and 11 U.S.C. § 727(a)(4)(A)
### Failure to Keep or Preserve Books and Records in GTH Bankruptcy Case

351.    Plaintiff incorporates by reference the facts and allegations contained in paragraphs 1 through 350.

352.    GTH is an insider of the Defendant pursuant to 11 U.S.C. § 101(31).

353.    11 U.S.C. § 727(a)(7) provides that the Court shall deny a debtor a discharge if "the debtor has committed any act specified in paragraph (2), (3), (4), (5), or (6) of this subsection, on or within one year before the date of the filing of the petition, or during the case, in connection with another case, under the title or under the Bankruptcy Act, concerning an insider."

354.    GTH filed the GTH Bankruptcy on June 18, 2024.

355.    Plaintiff further alleges upon information and belief that the failure to keep or preserve books and records in the GTH Bankruptcy occurred within one year of the filing of the Defendant's bankruptcy case.

356.    11 U.S.C. § 727(a)(3) provides that the Court shall deny a debtor a discharge if "the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure act was justified under all the circumstances of the case."

357.    Plaintiff is informed and believes and thereon alleges that the Defendant in connection with the GTH Bankruptcy has, within one year before the petition date in the Bankruptcy Case, or during the Bankruptcy Case, concealed, destroyed, mutilated, falsified, or failed to keep or preserve recorded information, including books, documents, records and papers, from which GTH's financial condition or business transactions might be ascertained

358.    Defendant's concealment, destruction, falsification, or failure to keep or preserve records in the GTH Bankruptcy Case from which GTH's financial condition or business transactions are unjustified.

359.    Therefore, Defendant should be denied his discharge.

44

## COUNT IX
### Denial of Discharge of Defendant
### Under 11 U.S.C. § 727(a)(7) and 11 U.S.C. § 727(a)(4)(D)
### Withheld Recorded Information from an Officer of the Estate in GTH Bankruptcy Case

360.    Plaintiff incorporates by reference the facts and allegations contained in paragraphs 1 through 359.

361.    GTH is an insider of the Defendant pursuant to 11 U.S.C. § 101(31).

362.    11 U.S.C. § 727(a)(7) provides that the Court shall deny a debtor a discharge if "the debtor has committed any act specified in paragraph (2), (3), (4), (5), or (6) of this subsection, on or within one year before the date of the filing of the petition, or during the case, in connection with another case, under the title or under the Bankruptcy Act, concerning an insider."

363.    GTH filed the GTH Bankruptcy on June 18, 2024.

364.    Plaintiff further alleges upon information and belief that Defendant knowingly and fraudulently, withheld from Northrup recorded information, including books, documents, records and papers, relating to Defendant's property or financial affairs in the GTH Bankruptcy case within one year of the filing of the Defendant's bankruptcy case.

365.    11 U.S.C. § 727(a)(4)(D) provides that the Court shall deny a debtor a discharge if "the debtor knowingly and fraudulently withheld from an officer of the estate entitled to possession under this title, any recorded information, including books, documents, records, and papers, relating to the debtor's property or financial affairs" in or in connection with the case.

366.    Plaintiff is informed and believes and thereon alleges that the Defendant in or in connection with the GTH Bankruptcy has, within one year before the petition date in the Bankruptcy Case, or during the Bankruptcy Case, knowingly and fraudulently, withheld from Northrup recorded information, including books, documents, records and papers, relating to GTH's property or financial affairs.

367.    Northrup is an officer of the GTH Bankruptcy estate entitled to possession of the recorded information relating to GTH's property or financial affairs.

368.    Therefore, Defendant should be denied his discharge.

## PRAYER

WHEREFORE, premises considered, Plaintiff prays for the following relief:

1.      On Count I against Defendant, for an order by this Court denying Defendant's discharge from his debts pursuant to 11 U.S.C. § 727(a)(2)(A);

2.      On Count II against Defendant, for an order by this Court denying Defendant's discharge from his debts pursuant to 11 U.S.C. § 727(a)(2)(B);

3.      On Count III against Defendant, for an order by this Court denying Defendant's discharge from his debts pursuant to 11 U.S.C. § 727(a)(3);

4.      On Count IV against Defendant, for an order by this Court denying Defendant's discharge from his debts pursuant to 11 U.S.C. § 727(a)(4)(A);

5.      On Count V against Defendant, for an order by this Court denying Defendant's discharge from his debts pursuant to 11 U.S.C. § 727(a)(4)(D);

6.      On Count VI against Defendant, for an order by this Court denying Defendant's discharge from his debts pursuant to 11 U.S.C. § 727(a)(5);

7.      On Count VII against Defendant, for an order by this Court denying Defendant's discharge from his debts pursuant to 11 U.S.C. § 727(a)(6)(A);

8.      On Count VIII against Defendant, for an order by this Court denying Defendant's discharge from his debts pursuant to 11 U.S.C. § 727(a)(7) and 11 U.S.C. § 727(a)(3); and

9.      On Count IX against Defendant, for an order by this Court denying Defendant's discharge from his debts pursuant to 11 U.S.C. § 727(a)(7) 11 U.S.C. § 727(a)(4)(D).

10.     For such other and further relief as the Court deems just and proper.

Dated: July 15, 2025     Respectfully submitted,

           KEVIN M. EPSTEIN
           UNITED STATES TRUSTEE
           REGION 7
           Southern and Western Districts of Texas


        By: */s/ Gary Wright*
           Gary Wright
           Assistant United States Trustee
           Texas State Bar No. 24047145
           903 San Jacinto Blvd., Room 230
           Austin, TX 78701
           PH: (512) 916-5328
           gary.wright3@usdoj.gov